## 9910

### MOSER v. FORT MILL MANUFACTURING CO.

#### (95 S. E. 342.)

1. MASTER AND SERVANT—DEATH OF SERVANT—CONTRIBUTORY NEGLIGENCE.—If it was defective and negligent construction of the machinery of a cotton mill to place a coupling between two close setting pulleys, and if such construction was a proximate cause of the lapping of the counter belt, which caused the death of the boss weaver, who was endeavoring to adjust the machinery, his death was not chargeable to his own negligence, where the testimony tended to fix the construction of the machinery as the business of the mill's machinist.

2. MASTER AND SERVANT—DEATH OF SERVANT—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.—In an action against a cotton mill for death of its boss weaver while attempting to adjust a counter belt, what the boss weaver was attempting to do when he was killed, and whether it was dangerous, *held* for the jury under the evidence.

Before SHIPP, J., York, Fall term, 1916.    Reversed.

Action by Barbara A. Moser, as administratrix of the estate of Thomas Gaston Moser, against the Fort Mill Manufacturing Company.    From an order of nonsuit, plaintiff appeals.

*Messrs. Spencer, Spencer & White,* for appellant, cite: *As to injuries caused to servant by defective machinery:* 95 S. C. 240.    *As to contributory negligence:* 82 S. C. 550; 95 S. C. 302.    *Where a servant sustains injury from a defect in machinery, there is prima facie evidence against master:* 71 S. C. 81.    *Servant does not assume the risk due to negligence of master:* 97 S. C. 403; 80 S. C. 238.

*Mr. Thos. F. McDow,* also for appellant, cites: *As to duty of master to see to it that its appliances and instrumentalities are in proper condition, and what burden of proof is cast upon him when injured servant shows that they were not:* 81 S. C. 203; 80 S. C. 237.    *Servant does not necessarily assume risks of master's negligence by remaining in his employment as such negligence becomes evident:* 72 S. C. 402; 18 S. C. 275; 35 S. C. 405; 95 S. C. 244.

*Messrs. Sirrine & Nettles* and *Wilson & Wilson,* for respondent, cite: *As to assumption of risks:* 86 S. C. 69; 61 S. C. 491; 72 S. C. 97; 76 S. C. 284-289; 82 N. E. (Ind.) 99; 93 S. C. 397.

1918.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

Action for tort to the person; order of nonsuit; appeal by the plaintiff.

The Court rested the order on two grounds: (1) That in the transaction the deceased represented the master, and if there was negligence it was that of the deceased and not of the master; and (2) that the deceased was guilty of contributory negligence in that he undertook to do a thing in an

unsafe way when a safe way was open to him. Out of an order of 2 pages which made only these two points, the appellants have spun 4½ pages of exceptions. The exceptions are verbose to a degree and they need not be reported; but they make the questions which we decide. The nonsuit ought plainly not to have been granted.

There were three witnesses sworn for the plaintiff, and two of them were eyewitnesses to the transaction.

The controversy arises out of these circumstances: There were two lines of overhead and parallel shafting in a cotton mill, 8 or 10 feet apart. One line was next and parallel to a wall, and that may be termed the "dead line;" but it was only dead because one of the hangers which supported it had lost a plunger, and swung loose, which necessitated a throwing off of the counter belt from the pulley of the dead line. Another line was 10 or 12 feet from the wall, and that may be termed the "live line." A counter belt 4 inches wide ran from the live to the dead line, and the drive was from the live line. There were two pulleys on the live line some 12 or 15 inches apart, and about 15 inches in diameter, and the counter belt was driven by one of these pulleys. Betwixt these two pulleys two ends of the shafting met and were joined by a coupling 8 or 9 inches long and of regular standard compression. Such was the adjustment of the machinery into which the deceased came.

The deceased was a boss weaver and had worked in cotton mills for 39 years. He was master of the weave room we have described. When his attention had been called to the loose hanger and the swinging shafting (the counter belt having been cast off the pulleys), he mounted a bench and redrove the plunger in the foot of the hanger and made it firm. He then mounted a stepladder and took hold of the loose counter belt. In a few seconds that belt lapped on the live shafting and suddenly and with great power detached the dead shaft from its moorings with such violence that it struck and instantly killed the boss weaver.

Out of this transaction arose two questions suggested as a basis for the nonsuit. Apart from his own intervention to make fast the hanger the testimony is perfectly plain that the boss weaver had no control or oversight over the construction of the machinery, to wit, the location of a coupling on the shaft; that was the business of the machinist. The testimony tended to prove that it was wrong construction to put a coupler so closely jammed betwixt two counter pulleys.

About that the witness, Jennings, testified:

"If the coupling had not been on that shaft between those two pulleys on the live shaft, I do not see how this accident could have happened. There would have been nothing for the belt to catch on. The pulleys on the live shaft were about 12 or 15 inches apart, with coupling in between. They were too close together for the coupling in between, I would think."

And the witness, Sheppard, testified:

"The only thing that was wrong with the shafting, so far as I could see, was the coupling should not have been where it was at. It was too close to the pulleys. In case of throwing off a belt, it was liable to catch it. It was defective in that respect, I would think. It was a four-inch belt. That coupling had to have a little crevice in it to keep from binding on the shaft. There were no set screws in the coupling. The pulleys were fastened with set screws. They are dangerous. There is danger of catching a man in putting on a belt. * * * I am not an expert in mill construction, but the coupling should not be betwixt two counter pulleys. Anybody ought to know that the coupling could not be betwixt the two pulleys as close as that is."

If it was defective and negligent construction to place the coupling betwixt two close setting pulleys, and if that was a proximate cause of the lapping of the counter belt, then that was not chargeable to the negligence of the boss weaver; for the testimony tended to fix that as

the business of the machinist, Blackwelder.   There was therefore no basis for the first postulate of the Circuit Court.

We come to the second ground of the order.   It is true that the Courts and textbooks declare that where two ways are open for a servant to do a thing he must take the safe way.   That is another way of saying he must not contribute to the event of his undoing by his own negligence.   .Assuming that to be true as a very general statement, with many modifications, yet the testimony does not warrant its so certain application to the circumstances of the instant case as to make proper a nonsuit.   The assumption of the defendant is that the boss weaver mounted the ladder with the intent to clap the counter belt from a live and rapidly revolving pulley on one shaft to a dead pulley on another shaft.   There is no testimony to sustain beyond controversy that assumption.   About that transaction two eyewitnesses testified as follows: Morris Moser said:

"Q. Do you know whether your father was attempting to put this belt back in the usual and customary way?   A. Well, if he had put it on, it would have been the first I ever saw him put on.   Q. It would have been the first?   A. Yes, sir.   Q. Mr. Moser, can you tell us how they put that belt on?   Before that?   A. They always got it straightened out and ready to put on, and then stopped the motor, and put the belt on, and started it up slow. * * * All those loom fixers adopted the same way and did the same way in putting it off and on as my father did.   When the belt was off, they got it and put it around the shaft, straightened it, stopped the motor, and put the belt on; that is, the counter belt."

And Jennings said:

"Then he got a stepladder and came back.   And it seemed, as the belt came off, it had a half twist, turned half over, and as he put it back it caught somehow or other.   He was facing right down the dead shaft. * * * Q. When a belt like that came off, what was the usual thing and the proper thing for a person in charge of the room or a person putting

the belt back to do?   A. We tried always, since I had been in the mill, to adjust it on the dead line, get it ready and stop off the motor, and put it back on the main line, the large belt, tie it on to the pulley, if not push it on if it was a small belt.   After they had adjusted, they would stop the motor and put it on, or, rather, start the motor and put it on.   Q. Was that what Mr. Moser was doing?   A. He didn't attempt to put the belt on.   He just straightened it out on top."

Under all the circumstances, therefore, of the instant case, it was for the jury to find, under proper instructions, what the boss weaver had a mind to do, and whether it was a dangerous thing to do.

The judgment of the Circuit Court is reversed and a new trial is ordered.